## COMMONWEALTH *vs.* PETER HURLEY.

Essex. April 9, 2009. - September 29, 2009.

Present: MARSHALL, C.J., IRELAND, SPINA, COWIN, CORDY, BOTSFORD, & GANTS, JJ.

*Constitutional Law,* Confrontation of witnesses, Assistance of counsel. *Practice, Criminal,* Assistance of counsel, Dismissal, Required finding, Confrontation of witnesses. *Evidence,* Unavailable witness, Cross-examination, Hearsay, Spontaneous utterance. *Due Process of Law,* Extrajudicial statement. *Witness,* Unavailability. *Identification.*

At a criminal trial, the admission in evidence of the victim's testimony at the defendant's pretrial detention hearing did not violate the defendant's right of confrontation, as guaranteed by the Sixth Amendment to the United States Constitution and by art. 12 of the Massachusetts Declaration of Rights, where the victim, who had died before trial, was clearly unavailable to testify; and where the defendant had both reasonable opportunity to cross-examine the victim at the pretrial hearing as well as a motive to cross-examine that was similar to his motive to cross-examine at the trial. [59-63]

At a criminal trial, the admission in evidence of portions of certain hearsay statements made by the victim in response to police questioning violated the defendant's right of confrontation, where, although the statements as a whole qualified as excited utterances, the defendant did not have an adequate prior opportunity to cross-examine the victim, who had died before trial, with respect to the accuracy and truth of those portions; however, the error in the admission of those portions, which were either inconsequential or focused on another crime of which the defendant was acquitted, was harmless beyond a reasonable doubt. [63-68]

A Superior Court judge, in response to a criminal defendant's motion for a required finding of not guilty at the close of the Commonwealth's case based on the failure of any witness to identify him at trial, did not abuse her discretion in allowing the Commonwealth to reopen its case to identify the defendant, where the defendant had yet to offer evidence in his defense, where the defendant suffered no unfair prejudice, and where one witness's failure to identify the defendant during earlier testimony arose from mere inadvertence by the Commonwealth. [68-69]

A criminal defendant failed to demonstrate that his trial counsel had rendered ineffective assistance by offering in evidence the transcripts of recorded telephone conversations the defendant had with the victim while the defendant was in jail prior to trial, from which the jury could have inferred that the defendant tried to influence the victim's testimony and pressure her to recant, where counsel's decision to offer the transcripts, although a poor strategic decision in hindsight, was not manifestly unreasonable, as the evidence served to impeach statements that the victim, who had died

before trial, had made to police, as well as her testimony at the defendant's pretrial detention hearing. [69-71]

INDICTMENT found and returned in the Superior Court Department on June 22, 2005.

The case was tried before *Leila R. Kern,* J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Sharon Dehmand* for the defendant.

*Kenneth Bresler,* Assistant District Attorney, for the Commonwealth.

GANTS, J. The defendant, Peter Hurley, was convicted by a Superior Court jury of assault and battery of Rose Bovio, but acquitted of assault and battery of Arthur Kluge. Because both Bovio and Kluge had died before trial, the Commonwealth offered in evidence portions of prior recorded testimony of Bovio at the defendant's pretrial detention hearing, as well as excited utterances made to the police by Bovio and Kluge. Represented by new counsel on appeal, the defendant argues (1) error in the admission of the prior recorded testimony of Bovio; (2) error in the admission of the statements Bovio made to police officers; (3) error in the denial of his motion for a required finding of not guilty at the close of the Commonwealth's case based on the failure of any witness to identify him at trial; (4) that he was denied effective assistance of trial counsel; and (5) that the cumulative effect of errors created a substantial risk of a miscarriage of justice. We transferred this case here on our own motion to address the defendant's claims that the admission of Bovio's prior recorded testimony and statements to police, in light of *Crawford* v. *Washington,* 541 U.S. 36 (2004) (*Crawford*), violated his right of confrontation as protected by the Sixth Amendment to the United States Constitution and by art. 12 of the Massachusetts Declaration of Rights. We reject the defendant's arguments and affirm his conviction.

*Background.* According to the evidence at trial, viewed in the light most favorable to the Commonwealth, at around 12:30 A.M. on March 22, 2005,[1] Officers James Christman and Brian Colella

---

[1]There were some minor variances in testimony concerning the date on

of the Peabody police department were separately dispatched to Kluge's apartment at 75 Central Street in Peabody, and arrived at approximately the same time. When they approached Kluge's apartment, Kluge, who had no legs, was in the hallway without his wheelchair using his arms to get back to his apartment. Kluge told the officers that he had been struck in the head and knocked out of his wheelchair by a man who had just left through a side entrance. The officers walked through the open front door of Kluge's apartment to retrieve his wheelchair and encountered Bovio in the living room.

Bovio was visibly upset, walking around with her hands flailing, and repeatedly stating, "I can't take it anymore." She told Officer Christman that she had been sitting in a chair against a wall in the living room of Kluge's apartment when her boy friend, the defendant, "had just beat on her," hitting her in the head and face. She stated that, when Kluge tried to stop him, the defendant stopped hitting her and turned to Kluge, striking him in the head hard enough to knock him out of his wheelchair and "so hard that he made an indentation in the wall." Bovio pointed to the chair in which she had been sitting, as well as to what Officer Christman observed was a "clear indentation" in the wall. Throughout this approximately two-minute conversation with Officer Christman, Bovio was crying, excited, and upset.

While Officer Colella went to look for the defendant, Officer Christman retrieved and started to fix Kluge's wheelchair, so that Kluge could sit in it. As he was doing so, Kluge suddenly fell forward, face first, to the ground, and did not appear to be breathing. Officer Christman radioed for an ambulance and for assistance from Officer Colella. Officer Colella responded seconds later with a defibrillator. Emergency medical technicians (EMTs) arrived within minutes, relieving the officers of their attempt to resuscitate Kluge.

Bovio had started screaming when she saw Kluge slump over, so Officer Christman moved her to a place in Kluge's apartment where she could not see the efforts to resuscitate Kluge and told her that she needed to calm down. About five to ten minutes

which the offense occurred. We use the above-stated date, noting that any discrepancy does not have any material bearing on the issues presented in the case.

after the end of her first conversation with Officer Christman, she recounted to him in more detail what had occurred. In this second conversation, she stated that, at approximately 5 P.M. on March 21, 2005, she and the defendant had met at the defendant's mother's house, which also was in Peabody,[2] and had started drinking in the garage. At some point after they arrived at Kluge's apartment, Bovio sent the defendant out for more beer. He was gone for about one and one-half hours. After the defendant returned to the apartment, he started to hit Bovio in the head. When Kluge tried to stop him, the defendant hit Kluge and knocked him out of his wheelchair. Bovio said the indentation in the wall was made by Kluge's body. After hitting Kluge, the defendant hit her in the head a couple more times and then left. Kluge telephoned 911 and left the line open. Bovio said that the defendant had produced a bruise and a large bump to the rear of her head. Officer Christman felt what he described as an "admirable bump on her head." Bovio stated that she and the defendant had each consumed four forty-ounce beers and a pint of hard alcohol that evening.

As Officer Christman was finishing his conversation with Bovio, he was informed that Kluge was breathing on his own, but was unconscious. Another officer told Officer Christman that the defendant had returned to the building. The defendant appeared, saw Kluge, and asked what had happened to him. The defendant smelled of alcohol. His eyes were bloodshot and glassy, and he was unsteady on his feet. Officer Christman and other officers then arrested the defendant.

Officer Christman went back to Kluge's apartment and spoke a third time with Bovio. She was still upset and appeared to be intoxicated. Her eyes were bloodshot and glassy, and she smelled of alcohol. At around 1:30 A.M., Officer Christman asked Bovio if she could write a statement detailing what had occurred. Bovio was reluctant until Officer Christman informed her that the defendant was in custody. Bovio stated that she had never gone to court before but would be going this time. In Officer Christman's presence, she wrote by hand a short, legible state-

---

[2]At the defendant's pretrial detention hearing, Bovio testified that the defendant's mother's house was one-quarter of one mile from Kluge's apartment.

ment of approximately thirteen lines, with only four to six words on any given line. The statement began, "I saw [the defendant] hit him then I really didn't see anything else. They were both gone, or I hid."[3]

Detective Katrina Mazzie of the Massachusetts State Police interviewed Bovio in Bovio's home later that morning at around 10 A.M. and spoke with her for about twenty to thirty minutes. The detective wrote down what Bovio said verbatim but did not testify as to the contents of Bovio's statement.[4]

On March 28, 2005, Bovio was scheduled to testify at the defendant's pretrial detention hearing, but called in sick. Detective Mazzie went to Bovio's house, and knocked on the door. Bovio did not answer the door for five minutes. When she did, she explained that she had just awakened. The detective drove Bovio to the court house, and accompanied her while Bovio met with the prosecutor and victim witness advocate before she testified in court. While Bovio appeared to be nervous, she did not appear to be physically impaired, confused, or under the influence of any drug or alcohol.

Most of Bovio's testimony from the pretrial detention hearing was admitted in evidence and read to the jury.[5,6] Because her testimony at the pretrial detention hearing is so important to this decision, we describe in detail the portions admitted in evidence at trial, at the risk of some repetition.

Bovio testified that she had dated the defendant, whom she identified in the court room at the pretrial detention hearing, for about one and one-half years. The defendant and Kluge, whom she knew as "Teddy," were acquaintances and "drinking buddies." At about 7 P.M. on the night of the incident, Bovio and the defendant started drinking beer at his mother's house, then left to walk downtown to buy vodka and rum. They arrived at Kluge's apart-

---

[3]The handwritten statement was not offered in evidence, and the balance of the statement was not read to the jury.

[4]Nor was the detective's verbatim report of the statement offered in evidence.

[5]A redacted transcript of the hearing was also admitted in evidence. Large portions of Bovio's testimony from her direct and redirect examination and all of her testimony from her cross-examination and recross-examination were heard by the jury and made available for them to read.

[6]The jury learned that Bovio and Kluge had died prior to trial through testimony and the admission of death certificates, which had the cause of death redacted.

ment around 9 P.M. and began drinking "the hard stuff." The defendant got drunk; she was getting drunk. The defendant "gets violent when he drinks [the hard stuff]," and he began pinching her. She hit him "as a reflex to get him to stop hitting me," and "[h]e got angry, louder, animated, and just started hitting me repeatedly in the head" with his fist. Kluge screamed for the defendant to stop and threatened to telephone the police. The defendant then jumped up, hit Kluge in the head, grabbed the telephone from him, and threw it. Kluge was "yelling back and forth" with the defendant and wanted him to leave. Bovio yelled at the defendant to stop, and both the defendant and Kluge left the apartment. Bovio said that Kluge left in his wheelchair; she did not see him come out of the wheelchair. Bovio next saw Kluge on the floor of the hallway; "he looked dead."

Bovio recalled that she had told the police officers who responded that night what had occurred, but was drunk and did not know what she had said. She recalled that she also had written a statement that night and that it was correct.

When the questioning at the pretrial detention hearing turned to Bovio's relationship with the defendant prior to the incident and his becoming violent when he drank, the judge gave the jury a limiting instruction concerning prior bad acts of the defendant. Bovio stated that she previously had seen the defendant become violent after drinking and that his conduct was "different every time." "We usually fight," she said. She said that he had hit her before on "[t]oo many" occasions. The defendant had punched her in the lip and in the head, and had left scars on her, including a scar on her mouth that the defendant inflicted "last summer." Bovio stated that, on three occasions, she had gone to the police after fights with the defendant. She contacted the police, she explained, because she gets "scared of him when he drinks." Bovio testified that she was afraid of the defendant, and that she told the defendant that she was tired of getting hit. She stated that the defendant "promised he wasn't going to do it again [and] he did it again, and here I am." She said she decided to testify because she did not want to "wait around until [the defendant] gets drunk and kills me."

During her cross-examination at the pretrial detention hearing, Bovio stated that she had one drink before she drove to the

defendant's mother's house around 5 P.M. on the evening of the incident. She had eaten nothing that day. The defendant's mother did not like them drinking in the garage, and around 7:45 P.M. told them to leave, allowing them until 8:30 P.M. to finish drinking their beer. After walking to the liquor store and then to Kluge's apartment, she sent the defendant out to get more liquor, and was upset that he took so long. Bovio walked to the defendant's mother's house to look for him. Not finding him, she began driving home in her automobile, but heard him whistle at her from a street corner, picked him up, and returned with him to Kluge's apartment. Bovio was "really drunk" when she wrote the statement for the police, but she was not forced to write it. She drove home after the incident.

During her redirect testimony, Bovio had no recollection of telling the police that the defendant struck Kluge so hard that he knocked him out of his wheelchair, or of seeing the defendant strike Kluge. She stated that she was truthful with police, but added, "I black out when I drink hard liquor."

The defendant did not testify at trial. He called three witnesses, two of whom testified that the wall in Kluge's apartment had been damaged in November, 2004, at a Thanksgiving dinner in a scuffle that did not involve the defendant. One of the witnesses also stated that Bovio would become aggressive when she drank rum and would slap and push the defendant. The defendant's mother testified that she observed Bovio to have been intoxicated, agitated, and "absolutely out of her mind" in the hours preceding the incident. The defendant also offered in evidence five transcripts of telephone conversations he had with Bovio while he was in jail after the incident, in which they discussed the incident and the circumstances surrounding Bovio's testimony at the pretrial detention hearing.

*Discussion.* 1. *Admission of prior recorded testimony.* The defendant argues that the admission of Bovio's testimony from the pretrial detention hearing violated his right to confront the witnesses against him, as guaranteed by the Sixth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights.[7] The judge admitted this testimony, over

---

[7]The Sixth Amendment to the United States Constitution, applicable to the States through the Fourteenth Amendment to the United States Constitution,

the objection of the defendant, in ruling on the Commonwealth's motion in limine before jury selection on the first day of trial. In *Crawford*, the United States Supreme Court held that testimonial out-of-court statements made by a declarant who is not a witness at trial are inadmissible under the confrontation clause of the Sixth Amendment, unless the declarant is unavailable to testify and the defendant has had an adequate prior opportunity to cross-examine the declarant. *Id.* at 57-59. A defendant has an adequate prior opportunity to cross-examine an unavailable witness when (1) the declarant was under oath at the prior proceeding, see *California v. Green*, 399 U.S. 149, 165 (1970); *Commonwealth v. Bohannon*, 385 Mass. 733, 747 (1982); (2) the defendant was represented by counsel at the prior proceeding, see *California v. Green, supra*; *Commonwealth v. Bohannon, supra*; (3) the prior proceeding was "conducted before a judicial tribunal, equipped to provide a judicial record of the hearings," *California v. Green, supra*; and (4) the prior proceeding was "addressed to substantially the same issues as in the current proceeding," and the defendant had "reasonable opportunity and similar motivation on the prior occasion for cross-examination of the declarant." *Commonwealth v. Johnson*, 435 Mass. 113, 135 (2001), quoting *Commonwealth v. Trigones*, 397 Mass. 633, 638 (1986). See Mass. G. Evid. § 804(b)(1), at 268, 280-281 (2008-2009). See generally *Commonwealth v. Roberio*, 440 Mass. 245, 248 (2003).

The defendant does not dispute that Bovio, because she was dead, was unavailable to testify at trial. Nor does the defendant dispute that Bovio was under oath at the prior judicial proceeding, that he was represented by counsel at the prior proceeding, and that a suitable judicial record — a certified transcript signed by a court reporter — was prepared of the prior proceeding. Rather, the defendant contends that the pretrial detention hear-

guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." The right of a criminal defendant to confront witnesses against him also is protected by art. 12 of the Massachusetts Declaration of Rights, which provides that in a criminal trial "every subject shall have a right to produce all proofs, that may be favorable to him [and] to meet the witnesses against him face to face." Because the defendant does not argue that art. 12 of the Massachusetts Declaration of Rights affords greater protection than does the Sixth Amendment, we do not discuss art. 12.

ing was focused on the issue of the defendant's dangerousness, not his commission of the assault and battery against Bovio, and, therefore, he had neither a reasonable opportunity nor a similar motivation to cross-examine Bovio at that hearing.

In a pretrial detention hearing under G. L. c. 276, § 58A, a judge must detain a defendant prior to trial if the Commonwealth meets its burden of proving by clear and convincing evidence that the defendant is so dangerous "that no conditions of release will reasonably assure the safety of any other person or the community."[8] *Id.* at § 58A (3). Among the issues the judge may consider in making this determination are the nature and seriousness of the danger posed by the defendant if released, and the defendant's family ties, employment record, history of mental illness, record of convictions, and reputation. *Id.* at § 58A (5).

"[T]o decide whether the defendant's motive to cross-examine at the earlier proceeding is similar to his motive to cross-examine at the current trial, '[t]he issue on which the testimony was introduced in the [earlier] proceeding as well as the purpose for which the testimony was offered must be substantially similar to the issue and purpose for which the same testimony is offered at the subsequent . . . trial.' " *Commonwealth* v. *Roberio, supra* at 253, quoting *Commonwealth* v. *Ortiz,* 393 Mass. 523, 532 (1984). At the pretrial detention hearing, Bovio's testimony was offered to show that the defendant had beaten her and Kluge, and that the defendant had a prior history of beating her, especially when he drank. Bovio's testimony at the pretrial detention hearing was offered at trial on these same two issues, except that the judge forbade the jury from considering the defendant's prior assaultive history as evidence that the defendant "has a criminal personality or a bad character" and limited them to consider it only as to the defendant's state of mind, his intent, his relationship with Bovio, and the absence of mistake or accident.

---

[8]The Commonwealth may move for pretrial detention, based on dangerousness, under G. L. c. 276, § 58A, only if the defendant is charged with a felony that has as an element the use, attempted use, or threatened use of physical force against another; a felony that by its nature involves a substantial risk that physical force against another may be used; an offense involving domestic abuse; or a violation of a protective order, including protective orders obtained under G. L. c. 209A. *Id.* at § 58A (1).

Defense counsel's cross-examination of Bovio at the pretrial detention hearing attempted to raise doubts as to her credibility on both these issues by suggesting that she was very drunk when the incident occurred and angry at the defendant for having left her alone with Kluge for so long while he supposedly went to buy more liquor.

The defendant argues that the focus of defense counsel's cross-examination of Bovio at the dangerousness hearing was to establish her intoxication so he could argue that, if an altercation did in fact occur, it resulted from a "drunken stupor of all parties present and not because the defendant is a dangerous person." The defendant's characterization of the focus of Bovio's cross-examination at the pretrial detention hearing is not supported by the record. Bovio was cross-examined about when she had contacted the defendant before the incident; when she had driven to his house; her going to his garage to drink; whether she had been drinking earlier; whether she was on any medication then or at the dangerousness hearing; whether she had anything to eat while drinking before the incident; how much and what she and the defendant each drank; when they went into the defendant's home and what they did therein; the purchase of liquor before the incident; how she and the defendant came to join Kluge; what they did at Kluge's apartment before the incident; Kluge's medical problems; the defendant's leaving Kluge's apartment to get more alcohol; whether she got mad at the defendant, screamed at him, said she hated him, and suspected him of being with another woman because he did not promptly return to Kluge's apartment; the defendant's and her return to Kluge's apartment; whether the defendant had obtained protective orders against her; the circumstances and accuracy of her first written statement to police; whether she was intoxicated; and her driving home after the incident. Thus, contrary to the defendant's contention, Bovio's credibility was examined in many ways, including her drunkenness and possible bias against the defendant.

A defendant is not entitled under the confrontation clause to a cross-examination that is "effective in whatever way, and to whatever extent, the defense might wish." *Delaware* v. *Fensterer*, 474 U.S. 15, 20 (1985). Rather, what is essential is that the "trier

of fact [have] a satisfactory basis for evaluating the truth of the prior statement." *Commonwealth* v. *Roberio, supra* at 251, quoting *Commonwealth* v. *Childs,* 413 Mass. 252, 263 (1992). See *Commonwealth* v. *Siegfriedt,* 402 Mass. 424, 429 (1988) ("it is sufficient that the previous cross-examination of [the declarant] provided the jury with a constitutionally adequate basis for evaluating the witness's credibility"). Although the cross-examination of Bovio at trial (were she alive) may have been different from and better than her cross-examination at the pretrial detention hearing, we conclude that the defendant had an adequate opportunity to cross-examine Bovio at the prior hearing, and therefore the use of that testimony at trial did not violate the confrontation clause. See *id.*; *Commonwealth* v. *Trigones,* 397 Mass. 633, 635-640 (1986).[9]

2. *Admission of excited utterances.* On the first day of trial, in ruling on the Commonwealth's motion in limine, the judge, over the defendant's objection, ruled that the oral statements made by Bovio after the police arrived were admissible as excited utterances. The Commonwealth did not seek to admit in evidence the statement Bovio wrote by hand later that morning or her oral statement made the next morning to Detective Mazzie.[10]

In a criminal case where the Commonwealth seeks to admit in evidence a hearsay statement, that is, an out-of-court statement offered to prove the truth of the matter asserted, it must jump two

---

[9]We acknowledge that there may be circumstances in which a defense counsel's motive to cross-examine a declarant at a pretrial detention hearing may differ from her motive to cross-examine at trial, such as where the defense counsel did not challenge the declarant's accuracy or credibility at cross-examination in the prior hearing and focused solely on challenging the defendant's dangerousness. We, therefore, declare no general rule that a witness's prior testimony at a pretrial detention hearing is always admissible at trial if that witness becomes unavailable. We simply conclude that, in the facts and circumstances of this case, the defendant's right of confrontation was protected because he had an adequate opportunity to cross-examine Bovio at the prior hearing.

[10]As noted earlier, the Commonwealth, during the redirect examination of Officer Christman, did have him read the beginning of Bovio's written statement, "I saw [the defendant] hit him then I really didn't see anything else. They were both gone, or I hid." Because the defendant did not object to the reading of these two sentences, and because they implicated the defendant only in the assault and battery of Kluge, for which he was acquitted, we do not consider the admissibility of these sentences in this decision.

hurdles. First, it must establish that the statement meets the criteria of an applicable hearsay exception under our common-law rules of evidence (here, the excited utterance exception). Second, unless the declarant is a Commonwealth witness at trial, it must establish that the admission of the statement would not violate the confrontation clause of the Sixth Amendment. See *Commonwealth* v. *Burgess*, 450 Mass. 422, 431 n.6 (2008); *Commonwealth* v. *Gonsalves*, 445 Mass. 1, 14 (2005) ("constitutional provision of the confrontation clause trumps the common-law rules of evidence").

As to the first hurdle, under our common-law rules of evidence, a hearsay statement may be admissible as an excited utterance if "(1) there is an occurrence or event 'sufficiently startling to render inoperative the normal reflective thought processes of the observer,' and (2) if the declarant's statement was 'a spontaneous reaction to the occurrence or event and not the result of reflective thought.' " *Commonwealth* v. *Santiago*, 437 Mass. 620, 623 (2002), quoting 2 McCormick, Evidence § 272, at 204 (5th ed. 1999). "As with any other witness, the declarant must have personal knowledge of the event in question, and must be competent." *Commonwealth* v. *King*, 436 Mass. 252, 255 (2002). See also Mass. G. Evid. § 803(2), at 243, 252-253 (2008-2009). The defendant does not challenge on appeal the judge's finding that these prerequisites were met.

As to the second hurdle, testimonial out-of-court statements made by a witness who did not testify at trial are not admissible against the defendant in a criminal case under the confrontation clause of the Sixth Amendment unless the declarant was unavailable to testify, and the defendant "had a prior opportunity for cross-examination." *Crawford, supra* at 54. Here, where the declarant had died before trial, the Commonwealth, to surmount this hurdle, must establish either (1) that the statement was nontestimonial or, (2) if it was testimonial, that the defendant had an adequate prior opportunity to cross-examine the declarant.

The Supreme Court declared in *Davis* v. *Washington*, 547 U.S. 813, 822 (2006):

> "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively

indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution."[11]

We have said that statements elicited through questioning by law enforcement agents "are per se testimonial and therefore implicate the confrontation clause" unless the questioning is intended to "secure a volatile scene or establish the need for or provide medical care." *Commonwealth* v. *Gonsalves, supra* at 9.[12]

The Commonwealth concedes that the statements made by Bovio in her two conversations with police at the scene of the incident — the statements made when the police first arrived and those made shortly after Kluge had collapsed — were testimonial. When the police arrived, there was no ongoing emergency, because the defendant had left. The primary purpose of the police questioning of Bovio was to find out what had happened in the past, potentially for further criminal investigation and prosecution. Kluge's collapse certainly triggered a medical emergency, but the questioning of Bovio that followed his collapse was not designed to assist the police or EMTs in responding to this emergency.

---

[11]The word "interrogation" "must be understood expansively to mean all law enforcement questioning related to the investigation or prosecution of a crime." *Commonwealth* v. *Gonsalves*, 445 Mass. 1, 8 (2005). See *Crawford* v. *Washington*, 541 U.S. 36, 53 n. 4 (2004) ("We use the term 'interrogation' in its colloquial, rather than any technical legal, sense").

[12]The admission of a testimonial statement without an adequate prior opportunity to cross-examine the declarant, however, violates the confrontation clause only if the statement is hearsay, that is, offered to prove the truth of the matter asserted. See *Crawford* v. *Washington, supra* at 59-60 & n.9, citing *Tennessee* v. *Street*, 471 U.S. 409, 414 (1985). See also *Commonwealth* v. *Caillot*, 454 Mass. 245, 255-256 (2009). Therefore, the admission of Bovio's statement to the police on their arrival that "I can't take it anymore," did not violate the confrontation clause because it was not offered to prove the truth of the matter asserted, but simply to show her state of mind. The same can be said for Bovio's comment to Officer Christman when he asked her to write a statement, namely, that she had never gone to court before, but would be going this time.

Because Bovio's hearsay statements were testimonial, their admission in evidence passes muster only if defense counsel had an adequate prior opportunity for cross-examination. In determining what constitutes an adequate prior opportunity for cross-examination, we consider three alternative formulations: (1) the defendant need only have had an adequate prior opportunity to cross-examine the declarant about the events in question; (2) the defendant must have had an adequate prior opportunity to cross-examine the declarant about the facts described in the excited utterance; or (3) the defendant must have had an adequate opportunity to cross-examine the declarant about the excited utterances themselves. We conclude that the second alternative is sufficient to satisfy the confrontation clause.

In *California* v. *Green*, 399 U.S. 149 (1970), the Supreme Court considered whether the confrontation clause allowed the prior inconsistent statement of a witness to be admitted in evidence for the truth of the matter asserted when the witness testified differently at trial. The Court concluded that it did, provided the witness was present at trial to explain or repudiate the prior out-of-court statement. *Id.* at 157, 160. "The witness who now relates a different story about the events in question must necessarily assume a position as to the truth value of his prior statement, thus giving the jury a chance to observe and evaluate his demeanor as he either disavows or qualifies his earlier statement." *Id.* at 160. See *Commonwealth* v. *Daye*, 393 Mass. 55, 75 (1984) (permitting probative use of prior inconsistent statements made under oath in certain circumstances).

An excited utterance need not be inconsistent with the witness's testimony to be admissible; its admissibility under the common-law rules of evidence is unrelated to whether it is consistent or inconsistent with the declarant's pretrial or trial testimony. Yet, just as with a prior inconsistent statement, the confrontation clause requires that the defendant have an opportunity on cross-examination to question the declarant who made a testimonial excited utterance as to the truth value of his prior statement.

Here, the excited utterances were offered in evidence at the pretrial detention hearing through the testimony of Officer Christman, who testified *after* Bovio had completed her testimony. Defense counsel did not cross-examine Bovio at the prior hear-

ing as to the excited utterances.[13] Yet, with four exceptions, the facts described in the excited utterances had been elicited during Bovio's prior testimony, and therefore defense counsel had an adequate opportunity to challenge the accuracy and truthfulness of those facts. The four exceptions are (1) Bovio said in her excited utterances that the defendant had knocked Kluge out of his wheelchair, but in her prior recorded testimony she did not recall how Kluge had left his wheelchair; (2) Bovio said in her excited utterances that Kluge had caused an indentation in the wall after he was struck by the defendant, but in her prior recorded testimony she did not mention any indentation or damage to the wall; (3) Bovio said in her excited utterances that the defendant hit her in the head a couple of times after he had struck Kluge, but in her prior recorded testimony she made no mention of this occurrence; and (4) Bovio said in her excited utterances that she had a bruise and a bump on her head from the defendant's blows, but in her prior recorded testimony she made no mention of them, saying only that the defendant had repeatedly hit her in the head.

We conclude that the defendant's right of confrontation under the Sixth Amendment was violated by the admission of the portions of Bovio's excited utterances that spoke of these four facts, because the defendant did not have an adequate opportunity to cross-examine Bovio with respect to their accuracy and truth. However, we also conclude that this constitutional error was harmless beyond a reasonable doubt in the circumstances of this case. The first two facts focused on the alleged assault of Kluge, for which the defendant was found not guilty. The third fact was inconsequential where Bovio's prior recorded testimony made clear that, on the night of the incident, the defendant had repeatedly hit her in the head. The fourth fact was also incon-

---

[13]The defendant, even if he had learned of the excited utterances through discovery, was not obliged to offer them in evidence (or otherwise inform the judge of their incriminating content) during the cross-examination of Bovio in order to preserve his opportunity to cross-examine Bovio as to her prior out-of-court statements. Nor was the defendant obliged to call Bovio back to the stand after the excited utterances had been admitted in order to have the opportunity to cross-examine her regarding the out-of-court statements. See *Melendez-Diaz* v. *Massachusetts,* 129 S. Ct. 2527, 2540 (2009) ("Confrontation Clause imposes a burden on the prosecution to present its witnesses, not on the defendant to bring those adverse witnesses into court").

sequential, because Officer Christman testified at trial to having felt an "admirable bump" on Bovio's head (and having seen no bruises), and a police photographer testified to the photographs he took of the part of her head where the bump was located. Both of these witnesses were subject to cross-examination about the bump. The error does not justify reversal of the conviction.[14]

3. *Motion to dismiss based on lack of identification.* After the Commonwealth rested its case, defense counsel moved to dismiss all charges on the ground that the defendant had not been identified on the record. Recollecting that Officer Christman had gestured at, and nodded to, the defendant during his testimony (which the record does not reflect), the judge, over the defendant's objection, allowed the Commonwealth to recall Officer Christman to establish that the person in the court room sitting next to the defense attorney was the defendant. We reject the defendant's contention that the judge erred in permitting the Commonwealth to reopen its case to offer this minimal identification evidence.

We recognize that, under Mass. R. Crim. P. 25 (a), 378 Mass. 896 (1979), when a defendant's motion for a required finding of not guilty is made at the close of the Commonwealth's evidence, the judge must rule on that motion at that time and may not reserve it. This prohibition against reserving decision, however, does not abridge the trial judge's discretion to permit the Commonwealth to reopen its case after it has rested where the defendant has yet to begin his defense, the defendant will suffer no unfair, substantial prejudice, and reopening is justified by "mere inadvertence or some other compelling circumstance." *Commonwealth* v. *Cote*, 15 Mass. App. Ct. 229, 241 (1983), quoting *United States* v. *Hinderman*, 625 F.2d 994, 996 (10th Cir. 1980). See *United States* v. *Leslie*, 103 F.3d 1093, 1104 (2d Cir.), cert. denied sub nom. *Williams* v. *United States*, 520 U.S. 1220 (1997) ("Generally, a district court will allow reopening [by the prosecution] to establish venue, identify the defendant, or attend to other technical matters"). See also *United States* v.

---

[14]We suggest that, in the future, when the Commonwealth in a criminal case seeks to admit the excited utterance of a declarant who is not a witness at trial or has completed his testimony at trial, the judge should conduct a careful voir dire, evidentiary if needed, before admitting the excited utterance in evidence.

*Gray*, 405 F.3d 227, 238 (4th Cir.), cert. denied, 546 U.S. 912 (2005) (allowing prosecution to reopen evidence to offer proof of mailings in mail fraud case); *United States* v. *Suarez-Rosario*, 237 F.3d 1164, 1167 (9th Cir. 2001) (allowing prosecution to reopen to establish true identity of defendant); *United States* v. *Mojica-Baez*, 229 F.3d 292, 299-300 (1st Cir. 2000), cert. denied, 532 U.S. 1065 (2001) (allowing prosecution to reopen to offer evidence that victim bank was insured by Federal Deposit Insurance Corporation); *United States* v. *Rouse*, 111 F.3d 561, 573 (8th Cir.), cert. denied, 522 U.S. 905 (1997) (allowing prosecution to reopen to establish jurisdictional element of Federal offense); 2A C.A. Wright, Federal Practice and Procedure § 462, at 282 (3d ed. 2000).[15]

Here, the judge did not abuse her discretion by allowing the Commonwealth to reopen its case to identify the defendant. The defendant had yet to offer evidence in his defense; he suffered no unfair prejudice; and Officer Christman's failure to identify the defendant during his earlier testimony arose from "mere inadvertence" by the Commonwealth. See *Commonwealth* v. *Cote, supra.*

4. *Ineffective assistance of trial counsel.* The defendant claims his trial counsel provided ineffective assistance by offering in evidence the transcripts of five recorded telephone conversations the defendant had with Bovio while he was in jail prior to trial. On the first day of trial, defense counsel told the judge that he sought admission of these conversations to impeach statements Bovio had made to police and at the defendant's

---

[15]The standard we set here for reopening the evidence in the Commonwealth's case is narrower than the standard articulated in *Commonwealth* v. *Wood*, 302 Mass. 265 (1939), which allowed the Commonwealth, in the judge's discretion, to reopen its case at any stage of the trial, even in the middle of the defense case. *Id.* at 267-268. The *Wood* decision, however, was decided before Massachusetts law required a judge to rule on a motion for a required finding filed after the Commonwealth has rested and before the defense was invited to present evidence. See *Commonwealth* v. *Kelley*, 370 Mass. 147, 150 & n.1 (1976); Reporters' Notes to Mass. R. Crim. P. 25, Mass. Ann. Laws, Rules of Criminal Procedure, at 1597-1598 (LexisNexis 2008). Because the standard established in *Wood* rested on the premise that the judge, in deciding a defendant's motion for a required finding filed after the Commonwealth has rested, could rely on evidence admitted during the defense case (indeed, the codefendant's case), and because this premise is no longer true under Massachusetts law, the *Wood* standard is no longer governing law.

pretrial detention hearing. Before the conversations were read to the jury, the judge conducted a colloquy with the defendant to ensure that the defendant understood that the conversations contained information and statements that could be viewed as prejudicial to him, and that he approved of his trial counsel's strategic choice.[16] The defendant agreed with the judge that he was "between a rock and a hard place," but stated he wanted the conversations to be admitted in evidence. He acknowledged to the judge that his decision was voluntarily, knowingly, and intelligently made. The defendant now claims that it was manifestly unreasonable for his trial counsel to seek to admit the conversations because the probative value of them was outweighed by their prejudicial effect.

Claims of ineffective assistance of trial counsel in noncapital cases are reviewed to see whether "there has been serious incompetency, inefficiency, or inattention of counsel . . . falling measurably below that which might be expected from an ordinary fallible lawyer," and, if that is found, whether that failure "deprived the defendant of an otherwise available, substantial ground of defence." *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974). If a defendant argues that counsel's strategy or tactics were faulty, he must show that the challenged tactical judgments were "manifestly unreasonable." *Commonwealth* v. *Gonzalez*, 443 Mass. 799, 809 (2005). "When the arguably reasoned tactical or strategic judgments of a lawyer are called into question, we do not 'second guess competent lawyers working hard for defendants who turn on them when the jury happen to find their clients guilty.' " *Commonwealth* v. *Rondeau*, 378 Mass. 408, 413 (1979), quoting *Commonwealth* v. *Stone*, 366 Mass. 506, 517 (1974).

The defendant did not bring this claim as part of a motion for a new trial but raises it for the first time on direct appeal. We strongly disfavor this approach. See *Commonwealth* v. *Zinser*, 446 Mass. 807, 811 (2006), and cases cited. Consequently, we

---

[16]The prosecutor, in the presence of the defendant, told the judge that the transcripts contained information indicating that the defendant was in jail because of the charges for which he was being tried, and that the Commonwealth was investigating the possibility of charging the defendant with manslaughter as a result of Kluge's death.

will reverse in these circumstances only if the factual basis for the claim "appears indisputably on the trial record." *Id.*, quoting *Commonwealth* v. *Adamides*, 37 Mass. App. Ct. 339, 344 (1994). The defendant is unable to satisfy this stringent standard on the trial record before us.

Because Bovio had died prior to trial, the admission of the conversations she had with the defendant while he was in jail served to impeach statements she had made to police, as well as her testimony at the defendant's pretrial detention hearing. For instance, Bovio stated in the transcribed conversations that she told police that the defendant did not hit Kluge and that she knew that the defendant was "in [here] for something [he] didn't do." Even if one of Bovio's statements to the defendant, asking him if he would be "cool" when released, suggested that she feared him, there was already evidence from the Commonwealth that she feared him. The content of the conversations served to provide multiple defenses for the defendant without his having to testify. In the conversations, the defendant was able to put before the jury, among other things, his own statements that he did not hit either victim; that Bovio was pressured by law enforcement to testify at his pretrial detention hearing; that Bovio's testimony at the pretrial detention hearing consisted of lies and was made under duress, as she had been hung over and on medication when she testified; that Bovio's original accounts to police were not true because she lied when she was drunk; that Bovio's recantation was credible; and that the police had it in for the defendant and Bovio was just a pawn.

These transcripts were certainly a two-edged sword, because the jury could have inferred from them that the defendant was trying to influence Bovio's testimony and pressure her to recant her earlier testimony that the defendant had struck her. While in hindsight it may have been a poor strategic decision to have offered these transcripts, we do not conclude indisputably on the trial record that trial counsel's decision to offer these transcripts in evidence was manifestly unreasonable.

5. What we have stated obviates the need to address the defendant's final argument concerning the cumulative effect of several errors.

*Judgment affirmed.*